**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ANGELIQUE S. LANTZ, as Personal Representative of the Estate of JUSTINE M. ROWE, | No. 53826-1-II |
| Respondent, | |
| v. | |
| STATE OF WASHINGTON; DEPARTMENT OF SOCIAL AND HEALTH SERVICES; and CHILD STUDY AND TREATMENT CENTER, | PUBLISHED OPINION |
| Appellants. | |

VELJACIC, J. — J.R., a former patient at a state run Child Study and Treatment Center (CSTC) sued the State of Washington, the Department of Social and Health Services (DSHS), and the CSTC, alleging violations of the Washington law against discrimination for sexual assault occurring at a place of public accommodation, sexual harassment, and negligence based on alleged sexual abuse. After a verdict for the defendants, J.R. discovered information revealing a seated juror, whose vote was necessary to sustain the verdict, had not disclosed material information during voir dire. J.R. moved for a new trial, which the defendants opposed. The trial court granted the motion, after which the defendants moved for an evidentiary hearing based on GR 37 because the challenged juror was the only juror of color. The trial court denied the motion for evidentiary hearing. The defendants appeal.

53826-1-II

We hold that the trial court did not abuse its discretion in granting a new trial. We also hold that, although the trial court applied the wrong legal standard in its GR 37 analysis, upon de novo review, the Defendants did not meet their burden of showing an inference of racial bias sufficient to require an evidentiary hearing. We affirm.

FACTS

J.R. was a former patient at the CSTC from ages 16 to 17. J.R. was involuntarily committed to the CSTC as a result of several suicide attempts at age 16. During their time there, J.R. met Matthew Grundhoffer, a counselor employed by CSTC. J.R. alleged that Grundhoffer began a sexual relationship with J.R., which continued for several years after J.R.'s release from CSTC. In 2018, J.R. sued the CSTC, DSHS, and the State of Washington (hereinafter collectively referred to as "Defendants") alleging various causes of action, including violations of the Washington law against discrimination for sexual assault occurring at a place of public accommodation, sexual harassment, and negligence based on alleged sexual abuse. Defendants claimed that no sexual relationship occurred at the CTSC. Defendants in part argued that J.R.'s trauma and mental health symptoms made J.R. imagine the improper conduct now being asserted.

The trial started in 2019. The prospective jurors were sworn in and provided a questionnaire to complete under oath, which explained that each potential juror should answer the questions completely and explain answers. The questionnaire contained 43 questions that covered topics such as child abuse, social services, false accusations, mental health treatment, and more. The instructions in the questionnaire explained the importance of candor in the jury selection process, and that the oath taken to answer questions truthfully applied to everything asked in the questionnaire. If a juror were to answer 'yes' to any question, the instructions asked that they briefly explain the circumstances involved.

2

53826-1-II

Juror 4[1] completed the questionnaire and was called in for individual questioning. During questioning, Juror 4 reported concern about a false allegation made against him, which he alluded to in questionnaire responses. J.R.'s counsel questioned Juror 4 about the false allegation. Juror 4 explained only that he was falsely accused of something but never knew who had accused him. Juror 4 also answered that a loved one had reported being abused. Upon further questioning, Juror 4 said he was referring to his ex-spouse, and that the abuse was perpetrated by the ex-spouse's former spouse. Juror 4 answered yes when asked if he could be fair and impartial in this matter.

Based on this interview and the questionnaire, no challenge for cause was made and no peremptory challenge was used on Juror 4, who was seated for trial. Juror 4, a Black man, was the only person of color on the jury, to include the two alternates.

Before closing argument, J.R.'s counsel discovered documents that they alleged would establish that Juror 4 had not been forthcoming when answering the questions on voir dire. J.R. moved to dismiss Juror 4, and replace him with an alternate. J.R.'s motion was based on a guardian ad litem report from 2001 and a petition for an order of protection from 2007. The court denied the motion. After deliberations, the jury returned with a 10-2 defense verdict. Juror 4 was one of the ten jurors finding against J.R.

After the verdict, J.R.'s counsel found additional information that Juror 4 had not disclosed during voir dire. On question 10, Juror 4 was asked if he or a family member had ever been involved in a civil lawsuit. Juror 4 answered "No." Clerk's Papers (CP) at 124. However, Juror 4 was personally involved in nine separate civil lawsuits regarding domestic relations and financial disputes.

---

[1] During voir dire, Juror 4 was referred to as "Prospective Juror 7."

53826-1-II

On question 23, Juror 4 was asked, "Have you ever had Child Protective Services (CPS), the police, or any other social welfare agency visit your house or the home of a family member or close friend about a child?" CP at 505. Juror 4 answered "No." CP at 505. However, Juror 4 had extensive interactions with CPS and law enforcement regarding his children, as evidenced by a guardian ad litem report filed in Pierce County Superior Court. This report stated that Juror 4 "filed unsubstantiated charges of abandonment and abuse of the child against [his ex-spouse[2]], in an attempt to gain custody of the child" and that "[Juror 4] had a history of erroneous reporting about [his ex-spouse] and the child, and that if it continued consideration would be given to filing legal charges against him." CP at 513-14. The guardian ad litem report further explained that the child in question was "well taken care of by [the child's other parent]," as observed through "*personal visits to the home*" by CPS. CP at 514 (emphasis added).

Furthermore, in Pierce County Superior Court, cause no. 01-2-01559-7, one of Juror 4's ex-spouses described a hostile incident with Juror 4, stating that Juror 4 was constantly calling the police and CPS resulting in multiple home visits.

Question 8 asked, "Do you have any children" to which Juror 4 responded, "Now by myself." CP at 123. Juror 4 answered "N/A" to follow up questions that asked for the number of children and their ages. CP at 123. Juror 4 also answered "N/A" to question 9 asking if he had any grandchildren. CP at 124. Juror 4 has five children and at least one grandchild.

Question 13 asked, "Have you or anyone close to you ever been <u>accused</u> of having physically, sexually, or emotionally abused or neglected a child?" CP at 124. Juror 4 answered "Yes," but when asked to explain the details, Juror 4 stated only, "[Spouse] Abandon me, move on." CP at 124. Question 15 asked, "Have you, or any member of your family or close friends,

_____

[2] Juror 4 has multiple ex-spouses that are referred to generally throughout this opinion.

4

53826-1-II

ever been <u>abused</u>, physically or sexually assaulted, or been a victim of domestic violence or any other violent crime?" CP at 124. Juror 4 answered "Yes" and provided: "my [ex-spouse] was beat up by [their first spouse]." CP at 124. Similarly, question 22[3] asked, "Were you or anyone you know assaulted or abused as a child?" CP at 125. Juror 4 again answered "Yes" but when asked for details, Juror 4 stated only "My [ex-spouse] was when a little [child]." CP at 125.

Inconsistent with these answers, in 2016, Juror 4 petitioned under penalty of perjury for a protective order claiming *he* was a victim of domestic violence. Additionally, Juror 4 provided details asserting his mother-in-law had "been trying to kill" Juror 4's spouse "for a long time." CP at 1902. Also inconsistent with his answers on the questionnaire, in 2007, the Pierce County Superior Court granted a one year protection order ruling Juror 4 "is RESTRAINED from causing physical harm, bodily injury, assault, including sexual assault, and from molesting harassing, threatening, or stalking . . . [Juror 4's child]." CP at 1936. Juror 4 was personally served with this order.

In 2002 pursuant to proceedings between Juror 4 and one of his ex-spouses, the Pierce County Superior Court, cause no. 01-3-01987-1, issued a parenting plan, supported by findings of fact and conclusions of law. The court found that Juror 4's "residential time [is limited due, in part, to] Physical, sexual or a pattern of emotional abuse of a child," CP at 2093, and that "[a] continuing restraining order against [Juror 4] is necessary because: there is a history of domestic violence and manipulation by [Juror 4] towards [spouse]." CP at 2107.

---

[3] The questionnaire is misnumbered. Question 22 appears twice on the form. This was the second question 22.

53826-1-II

Also in 2002, a guardian ad litem report to the Pierce County Superior Court, cause no. 99-3-02400-1, stated that Juror 4:

has a history of physical abuse to [their]children from previous marriage. [Juror 4] used religion to attract and manipulate [Juror 4's spouse] into a relationship initially, and continues to attempt to use [] religion to gain custody of [their child]. It is my believe [sic] that [Juror 4] is a danger to the child, both physically and emotionally, and [Juror 4's] contact with [their child] should be strictly limited and supervised.

CP at 514.

In 2001, Juror 4 and an ex-spouse filed competing lawsuits for protective orders, alleging each was committing child abuse against their child. On May 29, 2001, in Pierce County Superior Court, cause no. 01-2-01451-5, Juror 4 alleged that they were assaulted by the ex-spouse in the car, that the ex-spouse was endangering their child by leaving the child in a hot car, and that the ex-spouse then fled "as I was going to get a police officer." CP at 1952. Juror 4 also claimed the ex-spouse was endangering their child by letting the child "play with [the ex-spouse's] medicine" and "[the ex-spouse] hit [Juror 4] our [child] with whatever in [the ex-spouse's] hand. [The ex-spouse] grab him and throw him down" CP at 1953. The court granted Juror 4 a protective order. Also in 2001, Juror 4 was interviewed by the police about their child being a potential victim of abuse. Again, this information was inconsistent with Juror 4's responses on the juror questionnaire in this case.

Finally, question 40 asked, "Please describe any attitudes or experiences you have that you believe might be important for determining whether you could serve fairly and impartially as a juror in this lawsuit." CP at 508. Juror 4 responded "Yes" but then only stated "Believe for the best." CP at 508. Juror 4 did not disclose any of the information outlined above.

Based on the aforementioned inconsistencies between the newly discovered information and Juror 4's answers during voir dire, J.R. timely moved for a new trial under CR 59(a)(1), (2),

6

53826-1-II

and (9). The trial court granted J.R.'s motion for new trial, finding that "[t]here were a number of places where [] it's fair to say that Juror No. 4 either answered incorrectly or failed to provide information." 15 Rep. of Proc. (RP) at 2005. The trial court explained that "because neither party had the opportunity to question Juror No. 4 further on these topics and neither party had an opportunity to make challenges for cause, this is an irregularity that affects the substantial rights of the parties." 15 RP at 2006.

After the trial court's ruling, Defendants requested an evidentiary hearing for the trial court to properly oversee an inquiry into the alleged juror misconduct, so as to properly evaluate the allegations made and ensure that implicit racial bias did not render null the verdict already reached. Defendants' motion relied on GR 37 and the Washington Supreme Court's then recent guidance in *State v. Berhe*, 193 Wn.2d 647, 444 P.3d 1172 (2019), on addressing implicit racial bias in jury deliberations.

The court denied the motion for the evidentiary hearing, stating on the record:

> It is clear to me the Supreme Court does want Trial Courts to be very aware that implicit bias is an issue and it can come up in trial at any stage.
>      So the first thing I have to do under *Berhe* is to answer a threshold question. . . . [W]hether an objective observer *would* view race or ethnicity as a factor in the verdict. That is the question I need to answer.
>          . . . .
> Honestly, if there were racial motives, why go through the expense of a trial to wait and bring a challenge? It makes no sense. . . .
>      So I do not believe that an objective observer *would* view race or ethnicity as being a factor in this verdict. I am going to deny the request for an evidentiary hearing.

RP (Aug. 23, 2019) at 13-15. (emphasis added).

The court entered findings of fact and conclusions of law granting a new trial pursuant to CR 59(a)(1), (2), and (9), because if Juror 4 had accurately answered questions 10, 11, 15, 22, 23

7

27, 29, or 30 (described in paragraph nos. 2, 3, 4, 5, or 6 of the order), the information would have provided a valid basis for a challenge for cause.

Defendants appeal.

## ANALYSIS

In reviewing the grant of a new trial, we first address the standard of review, next we move to the juror misconduct at issue here, and finally we consider the trial court's denial of an evidentiary hearing regarding racial bias.

I.    GRANT OF a NEW TRIAL

Defendants take issue with the trial court's grant of a new trial to J.R.  We first address the standard of review.

A.    Standard of Review for Orders Granting a New Trial.

The Defendants argue that we should review the trial court decision to grant a new trial de novo, because we are in as good a position as the trial court to review J.R.'s evidence in support of the motion.[4]  We disagree.

The standard of review applied to orders granting a new trial generally depends on the issue reviewed by the appellate court and the record developed at trial.  We will first discuss CR 59(a), analyze relevant case law, and then evaluate the Defendants' argument.  Ultimately, we conclude that review of the trial court's order here is properly made under an abuse of discretion standard.

---

[4] We take this opportunity to note that Defendants fail to differentiate between discretion utilized by the trial court in its fact finding function and the discretion utilized by the trial court in the ultimate decision to grant the motion for new trial under CR 59.  These are different functions, as illustrated by our analysis in section B.4. below.  Because Defendants argue for the de novo standard we would utilize if the trial court found facts based solely on documentary evidence, we interpret their argument at page 31 of their brief as a request for de novo review of the findings of fact only, not as an argument for de novo review of the discretionary decision to ultimately grant the motion.  If Defendants are also requesting de novo review, under CR 59 alone, of the grant of the motion for new trial, we reject that request.

8

53826-1-II

The relevant grounds for a new trial are set out in CR 59(a), which states:

> On the motion of the party aggrieved, a verdict may be vacated and a new trial granted to all or any of the parties. . . . Such motion may be granted for any one of the following causes materially affecting the substantial rights of such parties:
>
> (1) *Irregularity in the proceedings* of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial;
>
> (2) *Misconduct* of prevailing party or *jury*; . . . or
>
> . . . .
>
> (9) *That substantial justice has not been done*.

(Emphasis added.)

In considering jury misconduct, the key question is whether "'such a feeling of prejudice [has] been engendered or located in the minds of the jury as to prevent a litigant from having a fair trial.'" *Coogan v. Borg-Warner Morse Tec Inc.*, 197 Wn.2d 790, 806, 490 P.3d 200 (2021) (internal quotation marks omitted) (quoting *Alum. Co. of Am. v. Aetna Cas. & Sur. Co.*, 140 Wn.2d 517, 537, 998 P.2d 856 (2000)).

"An order granting or denying a new trial will not be reversed except for an abuse of discretion." *Coleman v. George*, 62 Wn.2d 840, 841, 384 P.2d 871 (1963). "Findings of fact made by the [trial] court are accepted if they are supported by substantial evidence in the record." *City of Richland v. Wakefield*, 186 Wn.2d 596, 605, 380 P.3d 459 (2016). "However, the [trial] court's 'rulings as to the law' are reviewed de novo." *State v. Fisher*, 165 Wn.2d 727. 745, 202 P.3d 937 (2009).

A trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 668-69, 230 P.3d 583 (2010). "'A discretionary decision is based on untenable grounds or made for untenable reasons if it rests on facts unsupported in the record or was reached by applying the wrong legal standard.'" *McCoy v. Kent Nursery, Inc.*, 163 Wn. App. 744, 758, 260 P.3d 967

53826-1-II

(2011) (internal quotation marks omitted) (quoting *State v. Quismundo*, 164 Wn.2d 499, 504, 192 P.3d 342 (2008)). A trial court that "'relies on unsupported facts'" or "'a clearly erroneous assessment of the evidence'" necessarily abuses its discretion. *Clark v. Teng*, 195 Wn. App. 482, 492, 380 P.3d 73 (2016) (quoting *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 494, 145 P.3d 1196 (2006); *Demelash v. Ross Stores, Inc.*, 105 Wn. App. 508, 530, 20 P.3d 447 (2001)). Greater deference is owed the decision to grant a new trial than the decision to deny a new trial. *Kuhn v. Schnall*, 155 Wn. App. 560, 571, 228 P.3d 828 (2010).

The Defendants cite *McCoy*, 163 Wn. App. 744, to support their argument that de novo, rather than abuse of discretion, is the proper standard of review of the findings of fact made by the trial court. Defendants' reliance on *McCoy* is misplaced. In *McCoy*, this court reviewed the evidence de novo, and held that substantial evidence did not support the trial court's findings. *Id.* at 759. But the trial court had merely evaluated declarations; it did not hear testimony from the accused jurors; it made no written or oral findings of its recollection of voir dire or of credibility or weight accorded the competing declarations; and no record of voir dire existed. *Id.* The posttrial affidavits of counsel and jurors and other documentary evidence comprised the total basis of the trial court's findings on juror misconduct and the effect on the verdict. *Id.* This court reasoned that in general, "'appellate courts are in as good a position as trial courts to review written submissions' and may review de novo trial court decisions based on affidavits and other documentary evidence." *Id.* (quoting *In re Marriage of Rideout*, 150 Wn.2d 337, 350, 77 P.3d 1174 (2003)).

But unlike *McCoy*, here the trial court did not rely solely on documentary evidence in granting J.R. a new trial. On the contrary, the trial court made extensive factual findings based on not only the documentary record but also based on testimony that occurred during voir dire.

Additionally, Juror 4 filled out a multi-page questionnaire, and his individual questioning was observed by the trial court and transcribed by a court reporter. We are not in as good a position as the trial court to review this record, so we do not review de novo the trial court's findings of fact for its grant of a new trial. Rather, we will apply the abuse of discretion standard. We next turn to the juror misconduct at issue here.

B.      Juror Misconduct

The Defendants argue that the trial court abused its discretion in granting a new trial based on juror misconduct. We disagree. We first address the applicable legal principles, after which we conclude that substantial evidence supports the trial court's findings, which were material to the issue in the trial. Finally, we conclude that the trial court properly utilized its discretion in granting the new trial.

1.      Legal Principles

Voir dire examination serves to protect the parties' rights to a fair trial by exposing possible biases, both known and unknown, on the part of potential jurors. *Kuhn*, 155 Wn. App. at 574. During voir dire, the court and counsel "'ask the prospective jurors questions touching their qualifications to serve as jurors in the case.'" *State v. Lupastean*, 200 Wn.2d 26, 35, 513 P.3d 781 (2022) (quoting CrRLJ 6.4(b)).[5] Voir dire is "'conducted under oath'" and "'subject to the supervision of the court as appropriate to the facts of the case.'" *Id*. (quoting CrRLJ 6.4(b)). Voir dire has two purposes: "'discovering any basis for challenge for cause'" and "'gaining knowledge to enable an intelligent exercise of peremptory challenges.'" *Id*. (quoting CrRLJ 6.4(b)). Challenges for cause are governed by RCW 4.44.150 through .190. *Id*. A juror may be challenged for cause only for specified reasons, one of which is "implied" or "actual" bias. RCW 4.44.160,

_____

[5] CrRLJ 6.4(b) is directly quoted in *Lupastean*, 200 Wn.2d at 35.

53826-1-II

.170.  In contrast, a peremptory challenge is an objection to a juror for which no reason is given.

*Lupastean*, 200 Wn.2d at 35.

A juror's misrepresentation or failure to speak regarding a material fact when called on during voir dire can constitute juror misconduct.  *McCoy*, 163 Wn. App. at 760-61.  "It is well established that a juror commits 'misconduct' warranting a new trial if they answer 'falsely on voir dire, concealing [their] bias.'"  *Lupastean*, 200 Wn.2d at 37 (quoting *Nelson v. Placanica*, 33 Wn.2d 523, 529, 206 P.2d 296 (1949)).  To obtain a new trial, a party must show the juror failed to answer honestly where a correct response would have provided a valid basis for a challenge for cause, and "it affirmatively appears that a substantial right of the defendant was materially affected."  *Lupastean*, 200 Wn.2d at 49;[6] *Cf*. CR 59(a).

In exceptional cases, the courts will draw a conclusive presumption of implied bias from the juror's factual circumstances.  *State v. Cho*, 108 Wn. App. 315, 325, 30 P.3d 496 (2001).  "Once a trial court has determined the existence of juror misconduct, we give great deference to the trial court's determination of whether juror misconduct affected the verdict because the trial court 'observed all the witnesses and the trial proceedings and had in mind the evidence which had been presented.'"  *McCoy*, 163 Wn. App. at 759 (quoting *Halverson v. Anderson*, 82 Wn.2d 746, 752, 513 P.2d 827 (1973)).

A trial court appropriately exercises its discretion by granting a new trial when juror nondisclosure is unintentional but reveals an implied bias that would have supported a challenge for cause.  In *Lupastean*, the petitioner sought a new trial because one of the seated jurors failed to disclose information that was requested in voir dire, contending that nondisclosure impaired his ability to exercise peremptory challenges.  200 Wn.2d at 30.  Our Supreme Court considered

---

[6] CrRLJ 7.5(a) is directly quoted in *Lupastean*, 200 Wn.2d at 49.

12

whether a mistrial may be granted where the juror did not intend to answer falsely, and the undisclosed information may have supported a peremptory challenge, but may not have supported a challenge for cause. *Id*. at 37. The court held that:

> If a juror fails to disclose requested information in the jury selection process, a motion for a mistrial or new trial may not be granted solely because the undisclosed information might have triggered a peremptory challenge. Instead, as for other nonconstitutional trial errors, *the moving party must show that the juror's nondisclosure was prejudicial to the party's right to a fair trial*.

*Id*. at 53 (emphasis added).

The *Lupastean* court did not treat general juror nondisclosure as an inherently prejudicial error that automatically requires a new trial; rather, it concluded that juror nondisclosure must be treated like other nonconstitutional errors that require a new trial only on an affirmative showing of prejudice. *Id*. at 31. However, the *Lupastean* court also explicitly noted that:

> A juror's failure to disclose information that is properly and understandably requested during jury selection will certainly require a new trial if the undisclosed information reveals the juror's *actual or implied bias*. This is true regardless of whether the juror's failure to disclose was intentional because "[a] trial by a jury, one or more of whose members are biased or prejudiced, is not a constitutional trial."

*Id*. at 53 (internal quotation marks omitted) (emphasis added) (quoting *Berhe*, 193 Wn.2d at 658).

Additionally, in *Kuhn*, a former patient and parents brought an action against a pediatrician and clinic alleging sexual abuse. 155 Wn. App at 564. After the verdict, it came to light that one juror failed to disclose her childhood sexual abuse experiences, and another juror failed to disclose that she and her husband had been defendants in medical malpractice lawsuits. *Id*. at 573. The trial court accepted that both jurors' "omissions were honest and inadvertent failures to disclose," but nevertheless granted a new trial based on juror nondisclosure. *Id*. at 573 (internal quotation marks omitted). This court held that the trial court did not abuse its discretion in granting a new trial, reasoning that a prospective juror could be excused for implied bias, if she has "'an [i]nterest

13

. . . in the event of the action, or the principal question involved therein,'" and that a trial court must have discretion in determining what constitutes an "interest" because a great variety of fact patterns can arise. *Id*. at 574-75 (internal quotation marks omitted) (quoting *Carle v. McChord Credit Union*, 65 Wn. App. 93, 108, 827 P.2d 1070 (1992)).

Furthermore, the court reasoned that it was irrelevant that the omissions in question were not deliberate because the purpose of voir dire is to protect the parties' rights to a fair trial by exposing *possible* biases, both *known and unknown*, on the part of potential jurors. *Kuhn*, 155 Wn. App. at 575. Therefore, the court held that granting a new trial based on unintentional nondisclosure was a proper exercise of discretion by the trial court. *Id*.

Finally, courts have discretion to make an inference as to the likelihood of juror bias based on the specific factual circumstances. In *Cho*, the defendant filed a motion for a new trial after learning post-verdict that one of the sitting jurors had not disclosed that he was a retired police officer. 108 Wn. App. at 319-20. The motion was denied. *Id*. On appeal, the court held that there was nothing inherent in the experience or status of being a police officer that would support a finding of bias. *Id*. at 324. However, the court also opined that the trial court should have considered the possibility of implied bias. *Id*. at 326. This was due to the fact that "the transcript considered as a whole [raised] a troubling inference of deliberate concealment" because the juror failed to mention his past employment and did not respond when the judge asked if the prospective jurors have ever had a favorable experience with police. *Id*. at 327. The court determined that while it was possible the juror did not think this was worth mentioning, this possibility seemed unlikely, and it was more likely he deliberately construed his answers to the questions as narrowly and subjectively as possible so as to avoid having to reveal that he was a former police officer. *Id*.

14

at 328. The court in *Cho* remanded for further findings after an evidentiary hearing where the parties could present further testimony on the issue. *Id.* at 329-30.

>2. The Trial Court's Findings are Based on Substantial Evidence

The Defendants argue that the court abused its discretion in granting a new trial because the trial court's findings that Juror 4 gave false or misleading answers is not supported by substantial, admissible evidence. We disagree.

First, in response to question 15, "Have you, or any member of your family or close friends, ever been <u>abused</u>, physically or sexually assaulted, or been a victim of domestic violence or any other violent crime?", Juror 4 answered "'Yes'" and provided, "my [ex-spouse] was beat up by [their] first [spouse]." CP at 124. However, Juror 4 was a complainant in a petition for a domestic violence protection order where he asserted he was a victim, and failed to disclose this fact. Juror 4 also described to police that his child was a victim of abuse.

Second, in response to question 13, "Have you or anyone close to you ever been <u>accused</u> of having physically, sexually, or emotionally abused or neglected a child?", Juror 4 merely stated "[Spouse] Abandon me, move on." CP at 124. But Juror 4 was personally served with a protection order holding that they were "RESTRAINED from causing physical harm, bodily injury, assault, including sexual assault, and from molesting harassing, threatening, or stalking . . . [Juror 4's child]." CP at 1936. Also, in a different incident, Juror 4 and an ex-spouse filed competing lawsuits for protective orders, alleging each was committing child abuse against their child. A court appointed guardian ad litem determined that Juror 4 "is a danger to the child, both physically and emotionally, and [Juror 4's] contact with [the child] should be strictly limited and supervised." CP at 514. The judge presiding over Juror 4's divorce issued a "Final Order" on Juror 4's parenting plan holding that "[Juror 4's] residential time with the child(ren) shall be limited" under RCW

26.09.191 and then concluded this was due to "Physical, sexual or a pattern of emotional abuse of a child" and "[a] history of acts of domestic violence as defined in RCW 26.50.010(1) or an assault or sexual assault which causes grievous bodily harm or the fear of such harm." CP at 2092-93.

Finally, in response to question 23,[7] "Have you ever had [CPS] . . . , the police, or any other social welfare agency visit your home or the home of a family member or close friend about a child?", Juror 4 answered "No." CP at 505. But a guardian ad litem report detailed the child in question was well cared for by their other parent, as observed through a personal visit to the home by CPS. Additionally, in Pierce County Superior Court, cause no. 01-2-01559-7, another of Juror 4's ex-spouses described "[CPS] to my home 6-5-01" because Juror 4 was "calling police and [CPS] to have them come to our home constantly." CP at 2028. The trial court's findings 2 through 6 that Juror 4 gave false or misleading answers to questions 10, 11, 15, 22, 23, 27, 29, 30, and 40 are based on substantial evidence.

### 3. Materiality

Defendants argue that "Juror 4's interactions with CPS and the police about the alleged physical abuse of [their] children are not material to any issue in this discrimination case involving an allegation of sexual abuse within a mental health facility." Br. of Appellant at 43. We disagree because J.R.'s CPS involvement was emphasized by Defendants throughout the trial. In its opening statement, Defendants indicated that J.R. "had lots of CPS encounters." RP at 1063. Moreover, Defendants' expert, Janet Warren, testified during trial that she was struck by the 12 CPS referrals, indicating "a very unstable, problematic family." Ex. at 212A. Certainly, Defendants raised J.R.'s involvement with CPS at the trial court level, presumably because it was

---

[7] The questionnaire is misnumbered. There are two question 23s listed on the questionnaire. This is the second question 23.

53826-1-II

material to showing that J.R. lacked credibility and so their allegations must be false. Juror 4's involvement in CPS, too, was material to his ability to be fair and impartial, the key to J.R.'s right to a fair trial. This argument fails.

> 4. The Trial Court Properly Exercised its Discretion in Granting a New Trial

Defendants argue that the court abused its discretion in granting a new trial because there is no evidence that Juror 4 harbored actual bias toward J.R. We disagree.

As discussed above, actual bias is not required for a court to grant a new trial based on jury nondisclosure. *See Lupastean*, 200 Wn.2d at 53; *Kuhn*, 155 Wn. App. at 574-75. The purpose of voir dire is to protect the parties' rights to a fair trial by exposing *possible* biases, both known and *unknown*, on the part of potential jurors. *Lupastean*, 200 Wn.2d at 53; *Kuhn*, 155 Wn. App. at 574-75. Even where a juror's responses on voir dire do not demonstrate actual bias, courts may "draw a conclusive presumption of implied bias from the juror's factual circumstances." *Cho*, 108 Wn. App. at 325. The factual circumstances in this case suggest implied bias, and the trial court had the discretion to reach that conclusion.

Similar to *Cho*, where the court had doubts that the juror's nondisclosure was inadvertent, here J.R. could draw an inference of implied bias based only on the sheer volume of information that went undisclosed in voir dire. The volume of information withheld makes it highly unlikely that all of these nondisclosures were inadvertent, and even if they were, a challenge for cause based on implied bias would have been valid. *See Kuhn*, 155 Wn. App. at 574-75. Likewise, had J.R. known that Juror 4 was at the center of so many accusations, J.R. could permissibly draw an inference of implied bias on this alternative basis, and thereby excuse Juror 4 for cause.

Because Juror 4 was not forthcoming in disclosing information (i.e., the guardian ad litem report and CPS visits), Juror 4's failure to disclose requested information was a valid basis for a

17

53826-1-II

new trial because it revealed implied bias, and a trial by a biased jury is not a constitutional trial. *See Lupastean*, 200 Wn.2d at 53.

Moreover, we give deference to the trial court's decision to grant a new trial. This is the prevailing policy because the variety of fact patterns that can arise require the trial court to have a measure of discretion. *Kuhn*, 155 Wn. App at 574-75. Even the court in *McCoy*, which held that the trial court had abused its discretion, noted that once a trial court has determined the existence of juror misconduct, the reviewing court gives *great deference* to the trial court's determination of whether juror misconduct affected the verdict because the trial court "'observed all the witnesses and the trial proceedings and had in mind the evidence which had been presented.'" 163 Wn. App. at 759 (quoting *Halverson*, 82 Wn.2d at 752). Furthermore, greater deference is owed the decision to grant a new trial than the decision to deny a new trial. *Kuhn*, 155 Wn. App. at 571. Therefore, as applied to this grant of a new trial, we give greater deference to the trial court's assessment of the unique facts presented, indeed it is in a better position to do so.

Defendants also assert that Juror 4 disclosed ample information during voir dire and that some of Juror 4's answers were merely abbreviated; therefore, the onus was on J.R.'s counsel to ask follow up questions and seek clarification. We reject this argument as well.

Juror 4 answered questions in a manner that did not warrant follow up questions. On the written questionnaire, Juror 4 simply wrote "no" in regards to whether CPS had ever visited their home or the home of a family member about the welfare of a child. CP at 125, 505. In fact, Juror 4 had extensive dealings with CPS regarding their spouses and their own children, including a home visit as stated in the guardian ad litem report. Juror 4 also omitted other important information during individual questioning. J.R.'s counsel relied on Juror 4's answers as being truthful because they were given under oath.

18

53826-1-II

The trial court's findings of fact are based on substantial evidence in the record and it did not abuse its discretion in granting a new trial.

## II.     IMPLICIT RACIAL BIAS

Defendants argue that the trial court's legal conclusion in ordering a new trial should be vacated under de novo review because the trial court applied the wrong legal standard, and that the matter should be remanded for an evidentiary hearing. Additionally, Defendants argue that they made a prima facie showing that J.R.'s motion for new trial raised an inference of implicit racial bias by challenging the sole person of color on the jury.

Below, we address the standard of review, applicable legal principles, and the trial court's use of the wrong legal standard. In the end, reviewing the trial court's decision de novo, we hold that because an objective observer could not view race as a factor in the challenge of Juror 4 an evidentiary hearing was not required.

### A.      Standard of Review

Whether "'an objective observer could view race as a factor in the use of the peremptory challenge' is an objective inquiry. . . . [W]e stand in the same position as does the trial court, and we review the record and the trial court's conclusions . . . de novo." S*tate v. Jefferson*, 192 Wn.2d 225, 249-50, 429 P.3d 467 (2018) (plurality opinion) (quoting GR 37(e)).

### B.      "Objective Observer" Test

Washington courts have the inherent power to grant a new trial on the ground that substantial justice has not been done. CR 59(a)(9); *Henderson v. Thompson*, 200 Wn.2d 417, 430, 518 P.3d 1011 (2022). Upon a motion for a new civil trial due to the impact of racial bias during

19

the proceedings, courts will apply the "objective observer" test[8] to determine whether an objective observer who is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have influenced jury verdicts in Washington *could* view race as a factor in the verdict. *Id.* at 435; *see also Berhe*, 193 Wn.2d at 665. We apply the same standard here to determine whether the post-trial challenge based on Juror 4's participation was due to racial bias, and if so, whether the trial court's order granting a new trial should be vacated.

The litigant raising the issue of bias must make a showing sufficient to draw an inference of racial bias. *Henderson*, 200 Wn.2d at 435. When a civil litigant makes a prima facie showing sufficient to draw an inference of racial bias under this standard, the court must grant an evidentiary hearing to determine if racial bias affected the proceeding. *Id*.; *see also Berhe*, 193 Wn.2d at 665-66. At the hearing, the trial court must presume that racial bias affected the proceeding, and the party benefiting from the alleged racial bias has the burden to prove it did not. *Henderson*, 200 Wn.2d at 435.

C.      The Trial Court Applied the Incorrect Legal Standard

Instead of examining whether an objective observer *could* view race as a factor in the proceeding, the trial court instead used the wrong legal standard. The trial court described the standard as:

> It is clear to me the Supreme Court does want Trial Courts to be very aware that implicit bias is an issue and it can come up in trial at any stage.
>       So the first thing I have to do under *Berhe* is to answer a threshold question. . . . [W]hether an objective observer *would* view race or ethnicity as a factor in the verdict. That is the question I need to answer.

---

[8] Defendants' argue that we should apply GR 37 to determine whether race was a factor in J.R.'s challenge to Juror 4. While we do not agree that GR 37 is directly applicable, we do apply the objective observer test derived from GR 37 to analyze whether racial bias was a factor in J.R.'s challenge.

53826-1-II

RP (Aug. 23, 2019) at 13-14 (emphasis added).

The trial court was incorrect in using a "would" standard to make this determination. The correct objective observer "could" standard, articulated above, speaks to possibility, not certainty, and to impact, rather than intent. *Henderson*, 200 Wn.2d at 434. Therefore, the trial court applied the wrong legal standard.

The trial court committed legal error by applying the incorrect legal standard.

      1.  In Applying the Correct Legal Standard, We Conclude There Was a Valid Basis for a Challenge For Cause Unrelated to Juror 4's Race

The Defendants argue that we, on de novo review of the trial court's findings and conclusions, should hold that there has been a prima facie showing of implicit racial bias affecting the challenge to Juror 4, and therefore, we should vacate the order granting a new trial and remand to the trial court with instructions that it hold the required evidentiary hearing. We disagree.

Reviewing the record de novo, we conclude that an objective observer could not view race as a factor in the decision to grant a new trial, because there was an objectively valid reason for challenging Juror 4. The litigant raising the issue of racial bias must make a showing sufficient to draw an inference of racial bias. *Henderson*, 200 Wn.2d at 435. Here, Defendants merely assert that because Juror 4 was the only juror of color, implicit bias could have played a role in the challenge. But, as discussed above, there was a valid basis for a challenge for cause due to the significant information Juror 4 failed to disclose during voir dire. J.R. has shown that Juror 4 would have been dismissed for cause had he answered the juror questionnaire and the voir dire questions honestly. Therefore, an objective observer could not view race as a factor in the decision to challenge Juror 4, and Defendants have not met their burden. *See Berhe*, 193 Wn.2d. at 669.

21

53826-1-II

Defendants also argue that the trial court erred by looking solely at J.R.'s motive in challenging Juror 4, and was thus solely focused on "consciously held" explicit racial bias, not implicit racial bias that is unconsciously held. *See Id.* at 663. Defendants reason that because the court failed to go beyond simply considering J.R.'s motivations, the trial court committed legal error. But the record shows that the trial court did go beyond simply considering J.R.'s motivations. Further Defendants do not address the fact that as the party raising this issue, *they* have the initial burden of demonstrating *an inference* of an unconsciously held bias. And they fail in their initial burden because they stop at J.R.'s motivation in the first instance, only claiming in a conclusory fashion that J.R.'s motivation was based on Juror 4's race. As discussed above, there was a valid non-racial basis for concluding Juror 4 should have been removed for cause.

Additionally, the cases Defendants rely on do not support their argument. *Berhe* and *Henderson* each granted a new trial because of racial bias in the proceedings, and both opinions restate the court's commitment to eliminating racial bias from court proceedings. However, both cases were decided with the underlying goal of ensuring a *fair trial.*[9] *Henderson* and *Berhe* reason that denial of a *fair trial* is the reason why racial bias in court proceedings merits grant of a new trial. The *Berhe* opinion in particular points out the discretion trial courts have in determining the necessity of an evidentiary hearing, balanced with safeguarding the right to a *fair trial* by an impartial jury:

> We recognize that when allegations of juror misconduct arise after a verdict, trial courts have discretion to determine whether an evidentiary hearing is necessary. However, there are limits to this discretion, particularly in cases of alleged racial

---

[9] Indeed, disqualifying people of color without regard to whether they are impartial, but instead based only on race is the purpose underlying GR 37. A dubious history of excluding people of color from juries cannot be ignored, and when practiced, brings into question whether a fair trial has occurred. At the same time, it cannot seriously be argued that prohibiting disqualification of jurors of color based on race, is the same as prohibiting disqualification of a juror of color who is disqualified due to his bias.

22

53826-1-II

bias that deprives a defendant of his or her *constitutional right to a fair trial by an impartial jury.*

193 Wn.2d at 649 (emphasis added).

Juror 4's nondisclosures and ultimate seating on the jury denied J.R. a fair trial. There was cause to remove Juror 4, and Defendants made no prima facie showing that an objective observer could view race as a factor in the challenge of Juror 4 where, based on objective evidence, we conclude that a for cause challenge would have been successful. The trial court did not err in denying a request for evidentiary hearing.

We hold that the trial court applied the wrong legal standard. But on de novo review, and applying the correct standard, we also hold that an objective observer could not view race as a factor in challenging Juror 4 and no evidentiary hearing is warranted.

### CONCLUSION

We hold that the trial court did not abuse its discretion in granting a new trial. We also hold that, although the trial court applied the wrong legal standard in its GR 37 analysis, upon de novo review, Defendants did not meet their burden of showing an inference of racial bias sufficient to require an evidentiary hearing. We affirm.

_____
Veljacic, J.

We concur:

_____
Glasgow, C.J.

_____
Che, J.

23